# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DALE SAMUEL WAGGONER )
#362394, )
                  )
     **Petitioner,** )
                  )     **NO. 3:19-cv-00098**
**v.** )
                  )
**WARDEN HILTON HALL, Jr.,** )
                  )
     **Respondent.** )

## <u>MEMORANDUM OPINION</u>

The *pro se* Petitioner is a state inmate challenging an effective 18-year sentence for one count of aggravated robbery and one count of being a felon in possession of a firearm. (Doc. No. 22-1 at 15–17.) He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) The Court will deny his petition for the reasons set forth below.

## I.      BACKGROUND AND PROCEDURAL HISTORY

On November 6, 2012, a Davidson County Jury convicted Petitioner of one count of aggravated robbery, and he entered a best-interests guilty plea to one count of being a felon in possession of a firearm. (Doc. No. 22-1 at 15–17; Doc. No. 22-12 at 56.) The trial court sentenced Petitioner to 18 years in prison for the robbery and 3 years for the felon-in-possession count, to be served concurrently for an effective total sentence of 18 years. (Id. at 16–17.)

The Tennessee Court of Criminal Appeals affirmed the trial court's judgments on April 4, 2014, and the Tennessee Supreme Court denied discretionary review on September 2, 2014. (Doc. Nos. 22-9, 22-11.) Petitioner filed a *pro se* petition for post-conviction relief in the trial court on December 5, 2014. (Doc. No. 22-12 at 20.) The court appointed counsel, who took no action to prosecute the case. (Id. at 42–5.) Accordingly, the court appointed substitute counsel (id.), who

filed an amended petition on May 12, 2017. (Id. at 46–51.) The trial court held a hearing on July 12, 2017, and denied post-conviction relief on November 9, 2017. (Id. at 54–74.) The Tennessee Court of Criminal Appeals affirmed that judgment on October 30, 2018 (Doc. No. 22-16), and the record does not reflect that Petitioner sought discretionary review by the Tennessee Supreme Court.

Petitioner filed the pending habeas petition in January 2019, and Respondent acknowledges that it is timely. (Doc. No. 1; Doc. No. 23 at 1.) This is Petitioner's first petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## II.      STATEMENT OF FACTS

According to the Tennessee Court of Criminal Appeals' factual summary of this case on direct appeal, Petitioner and two co-defendants, Deonte Davis and Tiwon Harvell, were indicted for the January 20, 2011 aggravated robbery of a Mapco gas station.[1] (Doc. No. 22-9 at 1.) Mapco employee John Dellar testified at trial that at around 1:30 a.m. on that date, he saw a dark-colored, 4-door SUV outside the front door. (Id. at 2.) Dellar saw a man get out of the passenger side, walk around the vehicle and talk briefly to the driver, then enter the store. He described the man as African-American, around 6 feet tall, and wearing black pants, a black shirt, a black or dark blue hooded fur-trimmed coat, and a baseball cap. (Id.) The state court summarized Dellar's testimony of what happened next:

> The man then walked up to the cash register and told Dellar, "[G]ive me all the mother-f****** money." The man pulled up his black shirt, revealing a white T-shirt underneath, and retrieved a black automatic pistol with red sights from the front of his pants, which he pointed at Dellar. Dellar took the cash drawer out of the register and placed it on the counter. The man removed the money from the drawer, about $41 and some change, as well as a $2 bill stamped with the Mapco store number, and put it in his pants pocket. The man also took a carton of Newport cigarettes. The man then left and ran south through the parking lot. Dellar locked

---

[1] The cases against the three defendants were severed for trial. (Doc. No. 22-12 at 34.)

the door and called 9-1-1.  He gave a description of the robber and the suspect vehicle to the 9-1-1 dispatcher, and the police arrived about ten minutes later.

(Doc. No. 22-9 at 2.)  Dellar acknowledged having identified co-defendant Deonte Davis as the robber at the preliminary hearing but explained that he did so because Davis's face was very familiar due to a photo of him posted in the Mapco after the robbery to inform employees that he was not allowed in the store. (Id.)  Dellar identified the marked $2 bill, which was admitted as an exhibit, and the prosecutor played a copy of the store's surveillance video of the robbery for the jury. (Id.)

Metropolitan Nashville Police Department (MNPD) Sergeant Josh Blaisdell testified that he was about a mile away from the Mapco in an unmarked police car when he was dispatched to the robbery at 1:34 a.m. (Doc. No. 22-9 at 2.)  He very quickly noticed an SUV in a nearby vacant lot and followed it when it pulled onto the road. (Id.)  Sergeant Blaisdell activated his blue lights to make a traffic stop, but the SUV accelerated, so Sergeant Blaisdell activated his siren.  The SUV still did not stop, and Sergeant Blaisdell pursued the SUV at 60–70 miles per hour for about a mile on Old Hickory Boulevard until the SUV left the road and hit a tree. (Id.)  The driver, Tiwon Harvell, fled into the woods.  Sergeant Blaisdell found Petitioner and Deonte Davis still sitting in the SUV's passenger seat and backseat, respectively. (Id.)  Petitioner was wearing a black shirt. (Id.)  "Sergeant Blaisdell saw a baseball cap and a handgun on the front passenger floorboard, a carton of Newport cigarettes near the center console, and some cash underneath the driver's seat." (Id. at 3.)  Petitioner and Davis were taken into custody, and Harvell was captured about 5 minutes later. (Id.)

MNPD Detective Eric Harrison, Officer Greg Blackburn, and crime scene technician Rhonda Evans all testified that they were at the scene of the crash and saw the handgun in the front passenger floorboard, and Detective Harrison noticed that it had red sights. (Doc. No. 22-9 at 3.)

Officer Blackburn noted in his report that Petitioner was wearing a black, hooded jacket, black pants, and a black shirt. (Id.)  Ms. Evans testified about photographs she took of Petitioner's clothing, including "dark-colored pants, a dark-colored, hooded jacket, a white bank top, a black shirt, and black shoes." (Id. at 4.)  She acknowledged that she did not see any fur trim on Petitioner's jacket. (Id.)  Ms. Evans also testified that $41 in bills were recovered from the SUV. (Id. at 3–4.)  Officer Blackburn testified that he bagged and labeled a number of coins recovered from Petitioner and that a $2 bill was among the cash recovered from the scene. (Id. at 3.)

MNPD identification supervisor Lorita Marsh testified that a palm print lifted from the Newport cigarette carton and a thumbprint lifted from one of the open cigarette packs matched Petitioner's prints. (Doc. No. 22-9 at 4.)

Petitioner did not testify or present any witnesses at trial. (Id.)

### III.    ISSUES PRESENTED FOR REVIEW

Petitioner asserts three claims for relief:

1. Trial counsel was ineffective for failing to meaningfully communicate with Petitioner about the potential penalties for the offenses charged. (Doc. No. 1 at 6–8.)

2. Trial counsel was ineffective for failing to adequately investigate the facts of the case. (Id. at 8–10.)

3. The state violated Petitioner's right to due process by failing to give timely notice of sentence enhancement factors. (Id. at 10–12.)

### IV.    STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or

influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." Williams, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. Id. at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. Id. at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); but see McMullan v. Booker, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and reading Matthews to not take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Harrington, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. Pinholster, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. Title 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. Pinholster, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. Rose v. Lundy, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (explaining that exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of

the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." Id. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753. Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." Id. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see also Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (2004) (citing Murray v. Carrier, 477 U.S. 478, 495–96 (1986)); accord Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006).

## V.      ANALYSIS

### A.      CLAIM 1 – COUNSEL'S FAILURE TO COMMUNICATE

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687.  To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" Id. at 688–89.  The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).  Prejudice, under Strickland, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

The Supreme Court has further explained the Strickland prejudice requirement as follows:

In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

Harrington v. Richter, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington, 562 U.S. at 101. As the Supreme Court clarified in Harrington,

This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an

incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

<u>Id.</u> (internal quotation marks and citation omitted).

Here, Petitioner exhausted claims in post-conviction proceedings that trial counsel was ineffective for "(a) failure to adequately prepare for trial and communicate with [Petitioner]; (b) failure to advise [Petitioner] of his rights to testify on his own behalf; and (c) failure of trial counsel to explain the trial process and penalties for the crimes charged." (Doc. No. 22-14 at 2.) The Tennessee Court of Criminal Appeals accurately identified and explained the <u>Strickland</u> standard for federal ineffective-assistance claims. (Doc. No. 22-16 at 8.) It also summarized the testimony from the post-conviction hearing and analyzed the merits of all Petitioner's ineffective-assistance claims in a single analysis:

> At the post-conviction hearing, trial counsel stated the petitioner's family hired him approximately five months prior to trial. [Footnote omitted.] Over those five months, trial counsel met with the petitioner during his court appearances on June 14, 2012, October 5, 2012, and November 2, 2012. He met with the petitioner an additional three times, including a "meet and greet" followed by two "fairly lengthy discussions." During the meetings, trial counsel explained trial procedure, detailed the elements of the charged offenses and the State's burden of proof regarding the same, provided his opinion on the strength of the State's case, and reviewed discovery with the petitioner.
>
> After reviewing the discovery, trial counsel developed a defense theory which rested on misidentification. Trial counsel explained, "[i]n a robbery case when the person who is being robbed who is three feet away from the person who is trying to rob them can't identify them properly or accurately in a lineup, I found that [to be] a glaring hole." Regarding specific evidence at issue in the trial, trial counsel explained he did not know prior to trial that the $2 bill found on the petitioner after his arrest was stamped with the Mapco store number. As such, he did not discuss this fact with the petitioner prior to trial. However, trial counsel noted he and the petitioner did discuss how the State would utilize certain identifying pieces of evidence against him, including the clothing worn by the petitioner during the crimes, the $2 bill found on the petitioner after his arrest, and the gun, which was owned by the petitioner and "was all over the video." Additionally, because video evidence of the crime existed and it was "fairly straight forward," trial counsel did not utilize a private investigator in preparing for trial.
>
> Prior to trial, however, trial counsel discussed settlement offers with the petitioner

"on a couple of occasions because [trial counsel] thought it was a huge risk for him . . . with his history" to go to trial. Specifically, trial counsel recalled a fifteen-year offer, not an eight-year offer, but acknowledged "it may have been that low." Trial counsel also did not remember a twelve-year offer at eighty-five percent but stated, [i]f that's what it was, I'm sure that's what I presented to [the petitioner]."

Trial counsel acknowledged the State filed a notice of enhanced punishment and impeachment evidence identifying several of the petitioner's prior convictions. Based upon two prior felony convictions, trial counsel believed the petitioner was a Range I offender prior to trial. However, upon being convicted of the two present felonies, trial counsel thought the petitioner's offender status shifted to Range II. As such, upon conviction, trial counsel stated the petitioner was exposed to an additional twelve years in sentencing as a Range II offender. Based upon the petitioner's criminal history, trial counsel advised him against testifying at trial. Trial counsel acknowledged the petitioner did testify at his sentencing hearing.

The petitioner then testified, stating he met with trial counsel in jail "maybe once or twice." The petitioner indicated trial counsel failed to explain the trial process "how [the petitioner] believe[d] he should have," noting trial counsel failed to discuss the evidence against him or the elements the State was required to prove at trial. When asked if he and trial counsel reviewed discovery or discussed the strength of the State's case against him, the petitioner claimed, "[n]ot so much." The petitioner stated trial counsel did not discuss lesser-included offenses with him or the punishments they carried. Furthermore, the petitioner indicated trial counsel failed to explain the misidentification theory to him but admitted trial counsel mentioned the victim "identif[ied] someone else."

The petitioner remembered trial counsel conveying a settlement offer of "an eight at eighty-five percent," but could not recall if trial counsel believed it was a good offer. The petitioner stated trial counsel "wasn't sure" if he would be classified as a Range I or Range II offender. As such, trial counsel only discussed the sentencing range applicable to a Range I offender with him prior to trial. The petitioner stated he would have considered the applicable sentencing range he faced as a Range II offender in deciding whether to accept a plea deal had he been advised of the same by trial counsel.

The petitioner acknowledged trial counsel advised him of his testimonial rights and stated trial counsel "said it wasn't in [his] best interest" to testify at trial. The petitioner could not recall why he testified at his sentencing hearing, but stated trial counsel failed to advise him of the effect his testimony would have on his case moving forward. The petitioner stated if he had known of the effect his testimony might have on his case, he would not have testified at the sentencing hearing.

During cross-examination, the petitioner acknowledged he hired trial counsel on June 14, 2012, approximately five months prior to trial. The petitioner stated trial counsel met with him in jail, but they did "[n]ot really" discuss his case. The petitioner again stated trial counsel told him not to testify. However, he did not remember the trial court advising it would allow five prior convictions into evidence if he chose to testify. Additionally, the petitioner did not remember the

Momon[2] colloquy led by the trial court or signing a waiver regarding the same.

. . .

Here, the petitioner alleges trial counsel was ineffective by failing to meaningfully communicate with him or to prepare his case for trial. Within this context, the petitioner asserts several specific failures, including that trial counsel failed to explain the trial process to him and failed "to discuss with him the penalties for the offenses in which he was charged." The petitioner contends trial counsel's misunderstanding as to the petitioner's offender status "crippled the plea negotiations and did not give [the petitioner] a realistic outcome as he weighed his options between an eight-year offer to serve at eighty-five percent or whether he should risk going to trial." The petitioner also claims trial counsel "crippled" his defense "by relying solely on the 'misidentification' theory." Separately, the petitioner claims trial counsel failed to advise him of his right to testify or not testify at trial, arguing his testimony "would have assisted his defense and led the jury to a different result." The record, however, fails to support any of the petitioner's claims.

In denying relief, the post-conviction court first addressed the petitioner's allegation that trial counsel failed to effectively communicate with him or to prepare his case for trial. The post-conviction court stated,

> "no evidence has been presented to this court to substantiate the petitioner's allegation that trial counsel failed to be aware of the law applicable to the petitioner's trial" and "nothing in the record indicates that trial counsel failed to meet with the petitioner and keep him informed of the proceedings."

We agree. The record shows trial counsel met with the petitioner at least six times in the five months preceding trial. Trial counsel noted two of the meetings were particularly long during which they discussed discovery, the elements of the charged offenses, the State's burden of proof, trial procedures, trial strategies, the petitioner's testimonial rights and trial counsel's opinion regarding the same, the strength of the State's case, and the plea deals offered by the State. The post-conviction court accredited trial counsel's testimony and nothing in the record preponderates against its factual findings. See Tidwell [v. State], 922 S.W.2d [497,] at 500 [(Tenn. 1996)].

Furthermore, at the post-conviction hearing, the petitioner admitted he and trial counsel discussed many of the above topics and further offered only vague descriptions of his meetings with trial counsel in support of his claims. The petitioner also failed to provide any facts demonstrating how trial counsel "crippled" his case by relying on misidentification as a defense at trial. As such, the petitioner has failed to provide evidence detailing trial counsel's alleged failure

---

[2] In Momon v. State of Tennessee, 18 S.W. 3d 152 (Tenn. 2000), the Tennessee Supreme Court held that a defendant's constitutional right to testify should be safeguarded by hearings demonstrating on the record that any waiver of that right is intentionally made by the defendant personally. Those hearings are commonly referred to in Tennessee as "Momon hearings."

to communicate with him or to adequately prepare his case for trial. The petitioner is not entitled to relief.

Regarding the petitioner's sentencing exposure at trial, both trial counsel and the petitioner explained trial counsel "wasn't sure" if the petitioner was a Range I or Range II offender. The post-conviction court addressed this issue, as follows:

> Trial counsel admitted at the post-conviction hearing that he was not sure whether the petitioner met Range I or Range II classification prior to trial, and that he advised the petitioner of the same. The petitioner corroborated that his trial counsel advised he was not certain about the classification range. Both parties, however, testified that prior to trial the State offered a sentence of 8 years to serve at the Tennessee Department of Correction with 85% release eligibility. The petitioner rejected that offer and pursued a trial. Although trial counsel misadvised the petitioner that he may be considered as a Range I offender, this court takes judicial notice that the State's 8-year offer was at the lower end of the Range I sentencing range (8-12 years) and that it is not disputed that the petitioner was advised he may be sentenced within the Range II category should he be convicted at trial. While trial counsel misadvised the petitioner that his convictions from his instant trial would count towards his history and bump him to Range II, the court credits trial counsel's testimony that the petitioner was made aware that if he proceeded to trial he would be sentenced as a Range II Offender (12-20 years). Here, the petitioner was sentenced in the middle of the range with 18 years. Accordingly, the court finds that this error does not qualify the petitioner to a new trial.

In reviewing the record before us, we again agree with the post-conviction court. Though the petitioner asserts trial counsel only advised him of the sentencing range applicable to a Range I offender, the petitioner has failed to provide clear and convincing evidence to support his factual contention. Rather, the record indicates trial counsel informed the petitioner of the potential punishment associated with a Range II offender status after which the petitioner chose to proceed to trial. Specifically, after having been informed by trial counsel that he faced a potential sentencing range of twelve to twenty years as a Range II offender, the petitioner rejected the initial settlement offer of eight years, a minimum Range I sentence. Tenn. Code Ann. §§ 40-35-112(a)(2), -112(b)(2). The record further indicates the petitioner rejected all of the plea deals conveyed by trial counsel prior to trial, including the eight-year offer, despite trial counsel's advice regarding the risks of trial in light of the petitioner's criminal history and the potential Range II punishment he faced. Accordingly, the petitioner cannot prove prejudice resulting from this claim. Strickland, 466 U.S. at 694. The petitioner is not entitled to relief.

Finally, the post-conviction court also reviewed the petitioner's claim alleging trial counsel failed to advise him of his testimonial rights at trial. In denying relief as to this claim, the post-conviction court found the petitioner signed a waiver of his testimonial rights despite the petitioner not remembering the same. The post-

conviction court further determined trial counsel reviewed the pros and cons of the petitioner testifying at trial with the petitioner and also noted "the petitioner conceded that trial counsel advised him not to testify although he could not recall any other information during his cross-examination." Our review of the record supports the post-conviction court's findings as it is clear in the record trial counsel discussed the petitioner's testimonial rights with him during their pre-trial meetings. Further, the record indicates trial counsel advised the petitioner against testifying based upon the State's ability to impeach him, and the petitioner admitted to the same. The petitioner is not entitled to relief.

As detailed above, no evidence exists in the record to support the petitioner's attack on trial counsel's performance or how the alleged deficient performance affected the outcome of his trial. See Strickland, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

(Doc. No. 22-16 at 5–7, 9–11 (internal punctuation omitted).)

Petitioner now asserts that counsel's failure to give him accurate advice about his offender status and the penalties he faced prevented him from properly weighing the risks associated with rejecting a plea and going to trial. (Doc. No. 1 at 6.) He points to counsel's admission at the post-conviction hearing that counsel was not sure whether Petitioner was Range I or Range II before trial. (Id. at 7.) He also asserts that the Tennessee Court of Criminal Appeals wrongly stated that he was offered a plea deal for 8 years, because the final plea offer was for 12 years. (Id.) As explained above, to prevail on his claim here, Petitioner must establish that the state court's ruling was an objectively unreasonable application of Strickland and/or that it was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

Petitioner alleges that "[i]n the court's opinion it stated that I was offered an eight (8) year sentence but in actuality the last plea offer, it was a 12 year offer to serve in the Tennessee Department of Correction with 85% release eligibility date (RED)." (Doc. No. 1 at 7.) To the extent Petitioner challenges the state court's determination of the facts in this regard, he fails. Although counsel was less clear about the specifics of the plea offers, Petitioner himself testified at the post-conviction hearing that counsel had presented him with an offer for "eight at eighty-five percent." (Doc. No. 22-13 at 29.) Any mistake by the state court about the order in which the

plea offers were considered would be immaterial to this claim, but the state court expressly referred to the 8-year offer as "the initial settlement offer." (Doc. No. 22-16 at 10.) Accordingly, this allegation in the petition does not demonstrate that the state court's determination was based on an unreasonable factual determination.

On the more material issue, as the trial court explained in its order denying post-conviction relief, Tennessee law defines a Range II offender for sentencing purposes as a defendant with 2–4 prior felonies in certain classes, and Petitioner's previous convictions made him a Range II offender before trial. (Doc. No. 22-12 at 70 n.5.) Counsel's testimony at the post-conviction hearing made clear that he did not understand that fact, and Petitioner also testified that counsel was confused before trial about whether Petitioner was Range I or Range II at that time. (Doc. No. 22-13 at 11–13, 29.) But it is also clear from post-conviction testimony that counsel believed convictions in the instant case would raise Petitioner to a Range II offender for sentencing. (Id. at 12.) The state courts construed counsel's testimony to be that—even though counsel was incorrect about why—he advised Petitioner that he would be sentenced as a Range II offender with a possible sentence of 12–20 years if he were convicted at trial, and they credited that testimony: "While trial counsel misadvised the petitioner that his convictions from his instant trial would count towards his history and bump him to Range II, the court credits trial counsel's testimony that the petitioner was made aware that if he proceeded to trial he would be sentenced as a Range II Offender (12–20) years." (Doc. No. 22-16 at 10.)

Having been advised that he faced Range II sentencing if he went to trial, Plaintiff suffered no prejudice from counsel's faulty reasoning underlying that advice. Accordingly, the state court reasonably determined that Petitioner had not established that counsel's performance in this regard affected the outcome of his case. Because it is acceptable to dispose of an ineffective-assistance

claim solely for lack of prejudice, <u>Strickland</u>, 466 U.S. at 697, the Court need not address whether counsel's misunderstanding of the law constituted deficient performance.

Petitioner is not entitled to relief on this claim.

B.    CLAIM 2 – COUNSEL'S FAILURE TO INVESTIGATE

Petitioner next alleges that trial counsel was ineffective for failing to investigate the case sufficiently to discover that there was a distinct logo on the robber's clothing and a Mapco stamp on the stolen $2 bill. (Doc. No. 1 at 8.)   He also complains of counsel's failure to hire an investigator and that someone visited Petitioner in jail who may or may not have been acting on counsel's behalf, resulting in a potential breach of his attorney-client confidentiality. (<u>Id.</u> at 8–9.)

Respondent asserts that this claim was not exhausted in state court and is procedurally defaulted. (Doc. No. 23 at 17.)   With regard to Petitioner's complaints about counsel's failure to hire an investigator and the third-party jail visitor, Respondent is clearly correct.   Petitioner did not address either of those issues in his state post-conviction brief. (Doc. No. 22-14.)   Petitioner responds "N/A" to questions on the habeas petition form about raising Claim 2 on direct appeal or post-conviction and does not provide any explanation for failing to raise these issues in state court. (Doc. No. 1 at 9–10.)   Accordingly, any issues regarding the visitor or the failure to retain an investigator are procedurally defaulted and not subject to federal habeas review.

The matter is less clear regarding the alleged failure to investigate the clothing logo and the Mapco stamp on the $2 bill.   In his amended post-conviction petition, Petitioner alleged that "Trial Counsel failed to properly investigate" the case. (Doc. No. 22-12 at 49.)   Post-conviction counsel questioned trial counsel at the post-conviction hearing about both the clothing logo and the stamped $2 bill. (Doc. No. 22-13 at 9–10.)   And under the heading "Failure of Trial Counsel to Prepare for Trial and Communicate with Appellant," Petitioner asserted in his state court

appellate brief that counsel "fail[ed] to communicate crucial evidence" and that his "lack of

preparation and communication were determinantal" [sic] to Petitioner's defense. (Doc. No. 22-

14 at 18.) Respondent argues that Petitioner's state claim was about communication and the

current habeas claim is about investigation, so the claims are based on different theories. (Doc.

No. 23 at 17.) But Petitioner's filings in state court also expressly criticized counsel's investigation

and preparation, and the Court is required to construe Petitioner's pending *pro se* petition liberally.

Franklin v. Rose, 765 F.2d 82, 85 (6th Cir. 1985). The Court, therefore, finds that this claim was

exhausted in state court.

The relevant testimony by trial counsel about his knowledge of the clothing logo and the

$2 bill is as follows:

> Q. Okay. Did you discuss with Mr. Waggoner the other evidence that would have been presented by the State?
>
> A. Yes. The one thing I think the State missed was a logo on the armed robber's clothing at the time.
>
> Q. Okay.
>
> A. And there was a car chase involved in this – after the robbery. And a certain amount of moneys were in each of the pockets, both of Mr. Waggoner and his codefendant. And one was a particular piece of change, a two dollar bill.
>
> Q. And that was very unique – two dollar bills are pretty unique these days?
>
> A. It was.
>
> Q. And there was also a Mapco stamp on that two dollar bill?
>
> A. Yeah, that's – I did see the two dollar bill. I observed it when I went through the discovery. It was actually in the judge's chambers in a box. And I did not see a logo on the two dollar bill. As I recall, I had a conversation after the – after the fact – after the trial and the district attorney, whose name slips me, had told me he only found out about it about a week before the trial.
>
> Q. Uh-huh.
>
> A. So he was a half step ahead of me. But it had the logo, the Mapco stamped on the one side.
>
> Q. Okay. Now, did you disclose that to Mr. Waggoner prior to trial?
>
> A. No, I didn't know it prior to trial.

. . .

Q.     And did you discuss with Mr. Waggoner the specific items of clothing that the State had collected into evidence that matched the description made by the alleged victim?

A.     Yes, I did.  As I mentioned earlier, it had a – one of the pieces of clothing had a logo on it.

Q.     Okay.

A.     I think it was on the hip if I remember right.

(Doc. No. 22-13 at 9–10.)

Post-conviction counsel also questioned Petitioner at the post-conviction hearing about what trial counsel told him about his clothing:

Q.     Did [trial counsel] explain to you that it was really significant evidence that the State had taken from your person, from your body –

A.     Right.

Q.     -- the hoodie with the fur on it and items that were specifically identified by the victim in the case?

A.     Yes, he did.

(Id. at 27–28.)

The Court construes Petitioner's claim to be that counsel did not know about the clothing logo or the Mapco stamp on the $2 bill, and that if counsel had known those facts, the outcome of Petitioner's case would have been different.  But the record does not support that claim.  Trial counsel testified that "*the State* missed" that there was a distinctive logo on Petitioner's pants, but that counsel had noticed the connection and discussed it with Petitioner before trial.  Indeed, there appears to be a small logo on the left thigh area of the pants Petitioner was wearing when he was arrested (see Doc. No. 22-3 at 26–27; Doc. No. 22-4 at 106–11), which is visible on the robber's left thigh area in the "Front Counter" view of the videos shown to the jury. (Doc. No. 24.)  But the prosecution did not elicit any testimony from the Mapco clerk about seeing that logo during the robbery or ask any other witnesses to make the connection between the logo on Petitioner's pants

and the logo visible in the robbery video. These circumstances do not support Petitioner's allegation that counsel failed to investigate any issue concerning the pants logo or otherwise performed deficiently in connection with that issue.

Counsel acknowledged that he was unaware until trial that the $2 bill recovered after the crash bore Mapco's identifiable stamp. But he had looked at the bill and knew that a $2 bill in itself was "pretty unique." (Doc. No. 22-13 at 9.) Petitioner does not explain how knowledge of the Mapco stamp on the bill would have changed his position in plea negotiations or affected the defense strategy at trial. Given the overwhelming amount of evidence against Petitioner, the Court finds no reasonable likelihood that this single oversight had any impact whatsoever. Even without noticing the stamp, counsel believed and advised Petitioner that going to trial rather than taking a plea deal was "a huge risk" and that it was more likely than not that he would be convicted. (Doc. No. 22-13 at 8, 11.) Petitioner has not demonstrated any prejudice resulting from counsel's failure to notice the Mapco stamp on the $2 bill, and he is not entitled to relief on this claim.

C.      CLAIM 3 – NOTICE OF SENTENCE ENHANCEMENT FACTORS

Petitioner's final claim is that the state violated his right to due process by failing to give timely notice of sentence enhancements. (Doc. No. 1 at 10–11.) At the sentencing hearing, trial counsel said "Your Honor, I would ask the Court to disregard the enhancement factors. They weren't filed in a timely fashion. I haven't seen any of it yet." (Doc. No. 22-5 at 33.) He then went on to argue for a sentence at the low end of the Range II sentences. (Id. at 33–34.) The prosecutor did not respond about the timeliness of the enhancement notice, and the court did not address the issue. (Id. at 34–36.) Petitioner did not raise any issue about his sentence or the timeliness of the enhancement notice on direct appeal or in post-conviction proceedings. (Doc. Nos. 22-7, 22-14.)

Respondent asserts that this claim is procedurally defaulted. (Doc. No. 23 at 21.) Petitioner tries to explain his failure to raise this claim in state court by stating that "Petitioner did not have the full verbatim Sentencing hearing transcript to notice that the prosecutor had not filed a notice of enhancement with the court." (Doc. No. 1 at 11.) But the record firmly establishes that Petitioner's counsel was aware of and raised an issue regarding the timeliness of the notice, and that the sentencing hearing transcript was included in the record on appeal. Moreover, Petitioner was personally present at the hearing at which counsel objected to the lack of timely notice. (See Doc. No. 22-5.) Accordingly, he has not established any external bar or objective impediment to timely raising this claim in state court, as required to demonstrate cause for the default. Coleman v. Thompson, 501 U.S. 753 (1991). Claim 3 is procedurally defaulted and not subject to federal habeas review.

## VI.    CONCLUSION

Petitioner's claims are all either defaulted or fail on their merits for the reasons set forth above. Accordingly, the Court will deny the requested relief and dismiss the petition.

An appropriate Order will enter.


_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE